IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

**MEDITERRANEAN SHIPPING CO.**,

   Plaintiff,

   v.

**BEST TIRE RECYCLING, INC.**,

   Defendant.

Civil No. 13-1644 (BJM)

## OPINION AND ORDER

Mediterranean Shipping Co. ("MSC") brings this suit under the court's maritime and admiralty jurisdiction against Best Tire Recycling, Inc. ("BTR"), alleging BTR is liable for various freight charges that were assessed when cargo that was shipped from San Juan, Puerto Rico, was not accepted by the consignee when it arrived in Vietnam. Docket No. 1. MSC moved for summary judgment, Docket Nos. 28, 65, and BTR opposed, Docket No. 69. The parties consented to magistrate judge jurisdiction. Docket No. 62. For the reasons set forth below, MSC's motion is **GRANTED**.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" only if it "is one that could be resolved in favor of either party." *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004). A fact is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions" of the record materials "which it believes demonstrate the absence" of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The court does not act as trier of fact when reviewing the parties' submissions and so cannot "superimpose [its] own ideas of probability and likelihood (no matter how reasonable those ideas may be) upon" conflicting evidence. *Greenburg v. P.R. Mar. Shipping Auth.*, 835 F.2d 932, 936 (1st Cir. 1987). Rather, it must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." *Griggs-Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir. 1990). The court may not grant summary judgment "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. But the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and may not rest upon "conclusory allegations, improbable inferences, and unsupported speculation," *Medina-Muñoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).

## BACKGROUND

Except where otherwise noted, the following facts are drawn from the parties' Local Rule 56 submissions: MSC's undisputed statement of material facts ("USMF"), Docket No. 29, MSC's supplemental statement of material facts ("SSMF"), Docket No. 66, and BTR's opposing statement of material facts ("OSMF"), Docket No. 69-1.[1]

*The Parties*

---

[1] Local Rule 56 is designed to "relieve the district court of any responsibility to ferret through the record to discern whether any material fact is genuinely in dispute." *CMI Capital Market Inv. v. Gonzalez-Toro*, 520 F.3d 58, 62 (1st Cir. 2008). It requires a party moving for summary judgment to accompany its motion with a brief statement of facts, set forth in numbered paragraphs and supported by citations to the record that the movant contends are uncontested and material. D.P.R. Civ. R. 56(b), (e). The opposing party must admit, deny, or qualify those facts, with record support, paragraph by paragraph. *Id.* 56(c), (e). The opposing party may also present, in a separate section, additional facts, set forth in separate numbered paragraphs. *Id.* 56(c). The court may deem the movant's facts uncontested if they are not properly controverted in compliance with the rule, and litigants ignore it "at their peril." *Mariani-Colón v. Dep't of Homeland Sec. ex rel. Chertoff*, 511 F.3d 216, 219 (1st Cir. 2007).

MSC is an ocean common carrier that transports goods between the United States and foreign countries. USMF ¶ 1. It has filed its rules and tariffs with the Federal Maritime Commission, and those rules and tariffs have been published by its agent, Descartes Ocean Regulatory Services. USMF ¶ 2. BTR is a corporation based in Puerto Rico that, among other things, collected and transported scrap tires in Puerto Rico for four years. Docket No. 66-2. BTR's president is Hector Caro Ramos, and Nydia Caro ("Caro") worked as an administrative assistant for the corporation. Docket No. 66-2 at 1.

*The Transaction*

In early 2012, BTR's president contracted with Armstrong International, Inc. ("Armstrong"), through its representative John Wayne Kwange, [2] to deliver 40 containers of scrap tires to the Port of San Juan at a price of $600 per container. SSMF ¶ 1; Docket No. 66-2 at 2 ¶¶ 6–7. After BTR was informed that Armstrong sought to transport the tires to Vietnam, it asked Armstrong to contact MSC to book the voyages and to inform BTR once it had done so. SSMF ¶ 1; Docket No. 66-2 at 2 ¶ 7. On April 3, Armstrong's representative sent MSC an e-mail requesting rate quotes for a shipment of tires from San Juan, Puerto Rico, to Haiphong, Vietnam. SSMF ¶ 5. BTR was copied on this e-mail, and admits that it received it. *Id.* In this e-mail, the "Shipper" was identified as BTR. *Id.* The consignee was identified as Phong Vuong Limited Company. *Id.*

On April 11, a representative of MSC's agent, Oceanic General Agency, sent an e-mail to Armstrong's representative and Caro, BTR's administrative assistant, confirming the booking information for the voyages and informing them that the their trucker could start loading the cargo with the booking number provided in the e-mail. SSMF ¶ 6; Docket No. 66-1 at 15. To deliver the tires from its storage in Rincon, Puerto Rico, BTR subcontracted with IPM Transport ("IPM"). SSMF ¶ 3. After BTR had received the

---

[2] BTR filed a third-party complaint against Armstrong and John Wayne Kwange. Docket No. 49. After failing to serve these parties, this court denied BTR's motion to serve them by publication and dismissed BTR's third-party complaint against them. Docket Nos. 54, 59.

booking information from MSC, IPM picked up empty containers at the Port of San Juan. SSMF ¶ 3. The containers were then filled with scrap tires at BTR's storage. SSMF ¶ 3. After a representative from the Puerto Rico Environmental Quality Board inspected, weighed, and certified the cargo, BTR provided the booking information to IPM's truck driver so the loaded containers could be dropped off at MSC's cargo ship in the Port of San Juan. Docket No. 66-2 at 2 ¶ 7. From April to May 2012, this process was followed on multiple occasions to load the 40 containers onto MSC's ships. Docket No. 66-2 at ¶¶ 9, 15.

Upon the cargo's arrival to its destination in Vietnam, the consignee refused to accept delivery, allegedly because the shipment arrived late. Docket No. 66-2 at ¶ 14. Because the consignee refused to accept the shipment, MSC stored it. USMF ¶ 5. MSC permits storage of unclaimed cargo for a certain time period free of charge; after that time expires, demurrage charges[3] are imposed. USMF ¶ 5. As of August 6, 2013, the cargo incurred demurrage charges totaling $353,083.50, port-storage charges totaling $36,780, and an administrative fee totaling $300. USMF ¶ 5. In addition, $69,889.54 of the cost to ship the freight from Puerto Rico to Vietnam remains unpaid. USMF ¶ 5. MSC has attempted to collect these charges from BTR, which has refused to pay because it claims there is no contractual relationship between it and MSC.[4] USMF ¶ 19.

Importantly, it is undisputed that MSC "issued bills of lading for each of the shipments" that BTR had IPM deliver to the Port of San Juan. Docket No. 69-1 at 2 ¶ 4. Each of the bills of lading identified BTR as the shipper, the parties agree as to the terms included in the bill of lading, and BTR does not dispute the meaning or effect of the

---

[3] Demurrage charges are "charges to be assessed shippers or consignees who detain the carriers' freight containers beyond an allowable 'free time.'" *Maritime Service Corp. v. Sweet Brokerage De P.R., Inc.*, 537 F.2d 560, 560 (1st Cir. 1976).

[4] There is a genuine dispute as to whether BTR has paid MSC $25. USMF ¶ 7; OSMF ¶ 7. This dispute is immaterial because it does not affect whether BTR is ultimately liable for the various charges MSC seeks.

terms in the bill of lading. Docket No. 29-2–29-7. Under Clause 1 of MSC's bill of lading, a "Merchant" is defined to "include[] the Shipper, Consignee, holder of th[e] Bill of Lading, the receiver of the Goods and any Person owning, entitled to or claiming the possession of the Goods or of this Bill of Lading or anyone acting on behalfof this Person." Docket No. 29-22 at 2. Per this same clause, "Freight" includes "the freight and all charges, costs and expenses whatsoever payable to [MSC] in accordance with the applicable Tariff and this Bill of Lading, including storage, per diem and demurrage." *Id.* Clause 2 provides that "Every Person" who is a "Merchant" is jointly and severally liable for all of the various undertakings, responsibilities, and liabilities of another Merchant. *Id.* at 3. Clause 3 incorporates the terms and conditions of MSC's tariffs, which detail the rates used to calculate the demurrage charges and storage fees. *Id.* at 3. Finally, Clause 17 provides for the recovery of costs and legal expenses incurred to "recover any sums due," when the proceeds of a sale of the goods are insufficient to cover the costs and legal expenses incurred. *Id.* at 14.

## DISCUSSION

MSC moved for summary judgment to collect the demurrage charges, port-storage charges, administrative fee, and charges that remain unpaid for the cost of transporting the cargo from Puerto Rico to Vietnam. BTR has opposed summary judgment, primarily arguing that there is no contract between it and MSC.

I.  **The Bill of Lading**

BTR's primary argument is that it cannot be held liable because there was no contractual relationship between it and MSC, though it admits that bills of lading were issued when each of the scrap-tire shipments were delivered to the Port of San Juan. Under the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. § 30701 *et. seq.*, only a party to the bill of lading can be held liable for freight charges. *EIMSKIP v. Atlantic Fish Market, Inc.*, 417 F.3d 72, 75–76 (1st Cir. 2005). But COGSA does not create a cause of action for, or regulate the collection of, freight charges. *Id.* at 76. Where there is no

relevant statute, the general maritime law, as developed by the judiciary, applies. *Id.* Accordingly, general maritime law governs this case.

The Supreme Court has explained that "[o]rdinarily, the person from whom the goods are received for shipment assumes the obligation to pay the freight charges, and his obligation is ordinarily a primary one." *Louisville & N. R. Co. v. Central Iron & Coal Co.*, 265 U.S. 59, 67 (1924). In such situations, "to ascertain what contract was entered into [courts] look primarily to the bills of lading, bearing in mind that the instrument serves both as a receipt and as a contract." *Id.*; *see also Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 18–19 (2004) (in a maritime case, "[a] bill of lading records that a carrier has received goods from the party that wishes to ship them, states the terms of carriage, and serves as evidence of the contract for carriage.") (citing 2 T. Schoenbaum, Admiralty & Mar. Law §§ 58–60 (3d ed. 2001)); *Evergreen Marine Corp. v. Six Consignments of Frozen Scallops*, 4 F.3d 90, 92 n.1 (1st Cir. 1993) (the bill of lading serves "as a receipt that the carrier has received [the] goods for shipment; as a contract of carriage for those goods; and as documentary evidence of title to those goods."); *Crowley Am. Transp., Inc. v. Richard Sewing Mach. Co.*, 172 F.3d 781, 783 n.2. (11th Cir. 1999) ("the 'bill of lading' and the 'contract' are the same document.").

The presumption that the shipper is primarily liable may be rebutted if it is "shown, by the bill of lading or otherwise, that the shipper of the goods was not acting on his own behalf; that this fact was known by the carrier; that the parties intended not only that the consignee should assume an obligation to pay the freight charges, but that the shipper should not assume any liability whatsoever therefor; or that he should assume only a secondary liability." *Louisville & N. R. Co.*, 265 U.S. at 67.

In *EIMSKIP*, the First Circuit held that "[t]wo parties may each make themselves liable to a third party for payment of the same freight on a single shipment—one by a contract reflected in part by the bill of lading and the other by explicit promises and course of conduct independent of the bill of lading." 417 F.3d at 76. In that case, the

carrier, EIMSKIP, sued two parties—Atlantic Fish Market, Inc. ("Atlantic") and Mayflower International ("Mayflower")—when freight charges remained unpaid for a shipment from Massachusetts to Estonia. *Id.* at 74. The bills of lading for the various shipments listed Mayflower as the shipper, and Mayflower was the party that loaded the cargo onto the ships. *Id.* Atlantic negotiated the agreement with EIMSKIP, received the freight invoices, and paid part of the freight charges. *Id.* Under these circumstances, the district court found that Mayflower and Atlantic were both shippers of the cargo and that each could be held liable. *Id.* at 75.

The district court found that Mayflower was presumptively liable for the freight charges, in part, because it was listed as the shipper in the bills of lading and was the party from whom the goods were received. *See EIMSKIP v. Mayflower Int'l Ltd.*, 338 F. Supp. 2d 191, 197–98 (D. Mass. 2004). The First Circuit upheld that determination and noted that the presumption in *Louisville & Nashville R.R. Co.* "probably remains the usual situation." *EIMSKIP*, 417 F.3d at 77. The First Circuit also agreed with the district court that the presumption of Mayflower's primary liability had been rebutted where there was evidence that Atlantic had made oral promises to pay the freight charges. *Id.*

BTR's argument that it cannot be held liable for the freight charges lacks merit because the circumstances of this case are virtually analogous to those in *EIMSKIP*. 417 F.3d at 76. The gravamen of BTR's argument is that only Armstrong can be held liable for the freight charges because it never signed any agreement with MSC, and because Armstrong was the party who negotiated the freight charges with MSC. But in *EIMSKIP*, Mayflower was held liable where it was listed on the bills of lading and was the party from whom the goods were received—notwithstanding the fact that Atlantic had negotiated the freight charges, received the invoices, and paid part of these charges. *Id.* Moreover, BTR's signature or express consent was not required for it to be bound by the contractual terms in the bills of lading that MSC issued. *See, e.g.*, *Kanematsu Corp. v. M/V Gretchen W*, 897 F. Supp. 1314, 1317 (D. Or. 1995) ("the fact that [a party] did not

sign the bill of lading or directly consent to its conditions does not free it from [its] terms"). Accordingly, BTR is liable for the freight charges and the rates used to calculate those charges are found in the tariffs MSC filed and expressly incorporated into its bills of lading. *See Capitol Transp., Inc.*, 612 F.3d 1312, 1325 (1st Cir. 1979) (tariffs "are considered binding and in essence, carry the force of law"); *Gilbert Imported Hardwoods, Inc. v. 245 Packages of Guatambu Squares*, 508 F.2d 1116, 1120 (5th Cir. 1975) ("Once a tariff is established by the carrier and approved by the Federal Maritime Commission, the tariff binds both the carrier and the shipper with the force of law.").

Because BTR does not dispute it is the party from whom the goods were received, that it subcontracted with IPM to transport the scrap tires to MSC's ships at the Port of San Juan, or that MSC issued bills of lading for each of the shipments, BTR became primarily liable for the freight charges. *See Louisville & N. R. Co.*, 265 U.S. at 67; *EIMSKIP*, 417 F.3d at 76. BTR heavily relied on its argument that there was no contractual relationship between it and MSC, and so it made no effort to rebut the presumption that it is primarily liable for the freight charges. BTR also has not presented evidence that Armstrong promised to be primarily liable for the freight charges, or any other evidence of their dealings, as it claims that it had an oral agreement with Armstrong and has not been able to find any documents relating to their agreement. Docket No. 66-2 at 4. Rather, BTR "concedes that it could have clarified the matter by replying to those [e-mail] messages" in which it was identified as the "Shipper." Def.'s Opp'n 7. Because Clause 3 of MSC's bill of lading imposes joint and several liability on all merchants, and BTR does not argue that the bill of lading otherwise dictates varying tiers of liability among merchants, BTR is primarily liable for the various charges MSC seeks.

Continuing with its argument that it cannot be held liable for the costs imposed by the bill of lading, BTR claims "it is black-letter law that 'a *charter* comes into being and is binding and enforceable when the parties agree to its essential terms." Def.'s Opp'n 9 (emphasis added) (quoting 2 T. Schoenbaum, Admiralty & Mar. Law § 11-1 (5th ed.)).

However, BTR fails to recognize that contracts for the carriage of goods are not only entered into through a charter party. *See* 1 T. Schoenbaum, Admiralty & Mar. Law § 10-5 (5th ed.) ("Goods may be shipped under a charter party, a bill of lading, or both documents may be used."). "The charter party is the principal document of the tramp shipping industry. It is a specialized form of contract for the hire of an entire ship, specified by name." 2 T. Schoenbaum, Admiralty & Mar. Law § 11-1 (5th ed.). In contrast, a contract is entered via a bill of lading when a shipper's cargo will be placed on an ocean carrier along with cargo that belongs to other shippers. *See* 1 T. Schoenbaum, Admiralty & Mar. Law § 10-5 (5th ed.). Because BTR did not occupy an entire ship to transport its 40 cargo containers of scrap tires, there is a reasonable explanation why the contracts into which the parties entered were formed by bills of lading rather than by a charter party.

BTR also argues that a contract between MSC and BTR could not have been formed because it had "no personal or economic interest in th[e] transaction." Def.'s Opp'n 6. To the extent this argument implies BTR could not have entered into a contract with MSC because there was insufficient consideration, it lacks merit. Generally, "it is not a court's role, absent fraud or other exceptional circumstances, to evaluate the relative adequacy of the consideration." *See, e.g.*, *In re Newport Plaza Associates, L.P.*, 985 F.2d 640, 647 (1st Cir. 1993). But even if the court were to entertain BTR's argument, MSC did provide valuable consideration because it transported cargo from Puerto Rico to Vietnam and has stored that cargo in exchange for the freight charges allowed by the bills of lading. And the undisputed facts do not necessarily support BTR's general statement that it had no "personal or economic interest" in shipping the tires to Vietnam. It is undisputed that BTR had already been paid for the scrap tires that it agreed to deliver to the Port of San Juan per its agreement with Armstrong. By charging $600 per container for the 40 containers, BTR secured a business deal worth $24,000. Had the consignee in Vietnam not rejected the tires, BTR could have presumably gained a profit from that

$24,000 deal. Thus, BTR's argument that it stood to gain nothing from the transaction between it, Armstrong, and MSC is unavailing.

MSC argues in the alternative that even if BTR was not the "shipper" of the scrap tires, it could be held liable as Armstrong's agent because Clause 3 of MSC's bill of lading expressly includes agents within its definition of a "Merchant." MSC relies on *Mediterranean Shipping Co. v. AA Cargo, Inc.*, 46 F. Supp. 3d 294, 300 (S.D.N.Y. 2014) (*AA Cargo*). The defendant in that case, AA Cargo, admitted that it was serving as an agent for another party. *Id.* at 299. The parties disputed whether AA Cargo could be held liable for demurrage charges under a principal-agent theory. *Id.* The court ultimately held that AA Cargo could be held liable for the charges because it had admitted that it was serving as an agent for another and because the bill of lading in that case included "any person acting on behalf of another" within the definition of a "Merchant." *Id.* at 300. But unlike *AA Cargo*, BTR has not admitted that it was acting as Armstrong's agent. Although there might be a genuine dispute as to whether BTR was acting as Armstrong's agent, that dispute is immaterial because BTR is liable as a shipper of the cargo for the reasons discussed above.

Having determined that there was a contract between MSC and BTR, MSC's recovery is governed by the terms of the bills of lading. As discussed above, BTR admits the terms of the bills of lading, all of which have identical language, allow MSC to collect the various charges it seeks. USMF ¶¶ 8–13, 15–17. BTR also admits that the demurrage fees and storage fees were calculated according to the applicable tariff. USMF ¶¶ 9–10. Accordingly, summary judgment is granted in MSC's favor in the amount of $460,053—which includes demurrage charges totaling $353,083.50, port-storage fees totaling $36,780, a $300 administrative fee, and $69,889.54 resulting from unpaid charges relating to transporting the cargo from Puerto Rico to Vietnam. USMF ¶¶ 5–6.

**II.      Attorneys' Fees**

MSC requests attorneys' fees per clause 17 of its bill of lading. Clause 17 provides that:

> THE CARRIER, ITS SERVANTS OR AGENTS SHALL HAVE A LIEN ON THE GOODS AND ANY DOCUMENT RELATING THERETO FOR FREIGHT AND FOR GENERAL AVERAGE CONTRIBUTIONS TO WHOMSOEVER DUE. THE CARRIER, ITS SERVANTS OR AGENTS SHALL ALSO HAVE A LIEN AGAINST THE MERCHANT ON THE GOODS AND ANY DOCUMENT RELATING THERETO FOR ALL SUMS DUE FROM THE MERCHANT TO THE CARRIER UNDER ANY OTHER CONTRACT. The Carrier may exercise its lien at any time and any place in its sole discretion, through the action of any servant, agent or Subcontractor, whether the contractual carriage is completed or not. *The Carriers lien shall also extend to cover the cost and legal expense of recovering any sums due.* The Carrier shall have the right to sell any Goods liened by public auction or private treaty, without notice to the Merchant. *Nothing herein shall prevent the Carrier from recovering from the Merchant the difference between the amount due to the Carrier and the net amount realised by such sale.*

Docket No. 29-22 (both emphases added). Because Clause 17 allows MSC to place a lien on the goods shipped and allows that lien to "extend to cover the cost and legal expenses of recovering any sums due," MSC is entitled to attorneys' fees and costs. *Id.* However, Clause 17 provides that MSC may recover the "*difference* between the amount due to the Carrier and the net amount realised [sic] by [the] sale [of the goods over which MSC obtained a lien]." *Id.* (emphasis added). Although MSC is entitled to attorneys' fees, it must provide by separate motion an itemized statement detailing the amount of attorneys' fees and costs it seeks—taking into account any amount that has been realized by a sale of the scrap tires, if such a sale has occurred.

## CONCLUSION

For the foregoing reasons, the motion is **GRANTED**. **JUDGMENT** shall be entered in MSC's favor in the amount of $460,053. MSC shall file, no later than November 9, 2015, an itemized statement of the attorneys' fees and costs it seeks.

Case 3:13-cv-01644-BJM   Document 74   Filed 11/02/15   Page 12 of 12

Mediterranean Shipping Co. v. Best Tire Recycling, Inc., Civil No. 13-1644 (BJM)                                    12

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 2nd day of November 2015.

                                                 *S/ Bruce J. McGiverin*
                                                 BRUCE J. MCGIVERIN
                                                 United States Magistrate Judge